## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

```
SUPER WASH, INC.                    )
                                    )
                Plaintiff,          )
                                    )    04 C 4618
                v.                  )
                                    )
CARSON STERLING and C&W GROUP, INC.)
                                    )
                Defendants.         )
```

## MEMORANDUM OPINION

This trademark infringement case is before the court for ruling on the motion for summary judgment filed by defendants Carson Sterling and C & W Group, Inc. ("C & W") and the cross-motion for summary judgment filed by plaintiff Super Wash, Inc. ("Super Wash"). For the reasons explained below, the court denies defendants' motion for summary judgment and grants Super Wash's cross-motion for summary judgment in part. Specifically, the court finds defendants liable for trademark infringement and unfair competition under the Lanham Act and for common law unfair competition, but denies plaintiff's motion as it relates to the claim under the Illinois Uniform Deceptive Trade Practices Act.

## BACKGROUND[1]

---

[1] The following facts are undisputed unless otherwise noted.

For over twenty years, Super Wash has been engaged in providing a variety of automobile washing services and equipment throughout the United States under the trademark Super Wash. As part of its business, Super Wash grants non-exclusive licenses to qualified persons to operate Super Wash car washes. To identify the source, origin and sponsorship of Super Wash businesses and the services they offer, Super Wash has used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, which are registered on the Principal Register of the United States Patent and Trademark Office.[2] Super Wash and its authorized licensees use the Super Wash marks [3] as the marks and trade identity by which the products and services offered by Super Wash and its licensees are distinguished from other car wash businesses and the products and services offered by them.[4]

---

[2] In responding to Plaintiff's Local Rule 56.1 Statement of Additional Facts, defendants admit that plaintiff owns the Super Wash marks and that copies of the trademark registrations are attached, but defendants do not directly admit that the marks are registered on the Principal Register of the United States. (Defs.' Resp. to Pl's L.R. 56.1 Statement of Additional Facts, ¶ 16.) This fact is nevertheless deemed admitted pursuant to Local Rule 56.1 because defendants offer no specific references to affidavits, parts of the record, or other supporting materials to refute it. See N.D. Ill. L.R. 56.1.

There is another issue relating to Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts. Defendants contend that certain issues such as the validity of the marks, whether they are incontestable, etc. are questions of law whereas other issues, such as whether plaintiff has used the marks continuously, are facts that are not material to the present dispute. (See id.,¶¶ 15-17, 19.) We express no opinion regarding defendants' responses, but will include only those facts that are necessary for purposes of ruling on the motion for summary judgment.

[3] The Super Wash marks include, but are not limited to, SUPER WASH (registration number 1,633,436; effective 1.29.91), SUPER WASH (registration number 1,678,265; effective 3.10.92), SUPER WASH (registration number 2,826,902; effective date 3.30.04, and SUPERMATIC (registration number 1,755,735; effective date 12.8.92).

[4] This fact is deemed admitted pursuant to Local Rule 56.1. Defendants attempt to dispute this fact by stating that the products and services offered by Super Wash "are not particularly distinctive or unique." (Defs.' Resp. to Pl's L.R. 56.1 Statement of Additional Facts, ¶ 20), but in doing so, they miss

On or about May 13, 1998, defendant Sterling entered into two written contracts with Super Wash — the Operations Agreement and the Articles of Agreement — which granted Sterling a license to use the marks in the operation of a Super Wash car wash in Upland, Indiana (the "Upland Car Wash").[5] Sterling, an Illinois resident, operated the Upland Car Wash through defendant C & W, an Illinois corporation. Super Wash car washes, generally speaking, offer self-serve and brushless automatic car washing. Under the operating instructions set forth in the Operations Agreement, the owner/operator may not install brushes for customer use or allow attendants to use hand brushes without Super Wash's written consent. Despite that contractual requirement, defendants at some point installed brushes at the Upland Car Wash. On August 13, 2002. Super Wash confirmed that brushes had been installed. A few days later, on or about August 16, 2002, Super Wash instructed defendants to cease using the Super Wash marks at the Upland Car Wash.[6] Sterling attests that immediately after the August 16, 2002

---

the point. The point is that the Super Wash marks are used to distinguish Super Wash car washes from other car washes. Admitting this fact does not admit that Super Wash's products and services "are particularly distinctive."

[5] Sterling's former partner, Jeffrey Walters, was also a party to those contracts; Sterling later acquired Walter's interest in the business.

[6] This fact is supported by an affidavit from Susan E. Black-Beth, Vice President and Director of Franchising for Super Wash, whose duties included monitoring compliance with the terms of Super Wash's written licensing agreements. Although defendants attempt to dispute the content and date of the conversation (Defs.' Resp. L.R. 56.1 Statement of Additional Facts, ¶ 32), defendants have failed to cite any specific references to affidavits, parts of the record, or other supporting materials to refute this fact. See N.D. Ill. L.R. 56.1. Accordingly, this fact is deemed admitted pursuant to Local Rule 56.1.

conversation he removed all of the Super Wash marks from the Upland Car Wash except for the exterior "Super Wash" sign.[7] (Sterling 6.17.05 Aff. ¶ 5.) According to Super Wash, Super Wash again contacted defendants on or about October 21, 2003 to instruct them to cease using its marks. Sterling acknowledges that he had a second conversation with a Super Wash representative regarding the marks (although he does not concede the date of that conversation, which he cannot recall). According to Sterling, during the second conversation when Super Wash asked if all of the marks had been removed, he responded that all of the marks had been removed except for the exterior sign, and further informed Super Wash that it was welcome to remove the exterior sign at any time.[8] (Id. ¶¶ 6-7.)

Subsequently, Super Wash sent a cease-and-desist letter to Sterling dated April 16, 2004. In that letter, Super Wash set forth its understanding that defendants had terminated their relationship with Super Wash in November 2001 but continued to use the Super Wash marks, and demanded that Sterling de-identify the Upland Car Wash within two weeks of receipt of the letter.

---

[7] This fact, supported by Sterling's affidavit, was submitted in opposition to one of Super Wash's statements of fact, rather than as a statement of fact to which Super Wash was required to respond pursuant to Local Rule 56.1. Because this fact — which Super Wash makes no effort to refute — is consistent with the information the parties provided the court during the Rule 16 conference, for purposes of this motion the court accepts as true that the only Mark that remained on display at the Upland Car Wash after August 16, 2002 was the exterior sign.

[8] Although this fact is supported by Sterling's affidavit, it was submitted in opposition to one of Super Wash's statements of fact, rather than as a statement of fact to which Super Wash was required to respond pursuant to Local Rule 56.1. Additionally, according to the court's best recollection from the Rule 16 conference, there may be a dispute regarding this issue. Moreover, this fact is not essential to a ruling on the pending motions.

Sterling, however, claims that he never received the cease-and-desist letter.[9]

Then on July 14, 2004, Super Wash commenced this litigation, suing defendants for trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), false designation of origin in violation of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/2, and common law unfair competition. It is undisputed that the exterior sign with the Super Wash Mark remained on display at the Upland Car Wash until after Super Wash filed this lawsuit. Eventually, on or about September 1, 2004, defendants provided Super Wash with photographs demonstrating that they had removed all Super Wash marks from the Upland Car Wash.

With these facts in mind, we turn to the parties' cross-motions for summary judgment.

## DISCUSSION

### A. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

---

[9] Although the April 16, 2004 letter appears to have been sent by certified mail with a return receipt requested, there is no evidence before the court indicating whether a return receipt exists.

a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. Anderson, 477 U.S. at 248.

Here, Super Wash alleges that defendants used the Super Wash marks without consent after the licensing agreement was terminated, thus violating both §§ 1114 and 1125(a) of the Lanham Act, the IDTPA and common law regarding unfair competition. Although the case involves multiple claims, the parties agree that analysis of the Lanham Act claims will dispose of the claim arising under the IDTPA and the common law unfair competition claim.[10] See MJ &

---

[10]/ This assumes that Super Wash's IDTPA claim is viable. Although neither party raised the issue, the court questions the viability of that claim in light of the fact that there is no evidence that defendants used the marks in Illinois. The Illinois Supreme Court has ruled that the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS 505/2, does not apply to fraudulent transactions that take place outside of Illinois. Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E. 2d 801, 853 (Ill. 2005). Given that the ICFDBPA explicitly incorporates § 2 of the IDTPA, Publ'n Int'l, Ltd. v. Leapfrog Enter., Inc., No. 01 C 3876, 2002 WL 31426651, at *5 (N.D. Ill. Oct. 29, 2002), it seems unlikely that after Avery Illinois courts would recognize a claim under the IDTPA based on a party's use of another's trademark outside of Illinois.

Partners Rest. Ltd. P'ship v. Zadicoff, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) (legal inquiry is the same under the Lanham Act and IDTPA); Spex, Inc. v. Joy of Spex, Inc., 847 F. Supp. 567, 579 (N.D. Ill. 1994) (claims for deceptive business practices and unfair competition arising under state statute or common law "are to be resolved according to the principles set forth under the Lanham Act"); Clairol, Inc. v. Andrea Dumon, Inc., 303 N.E. 2d 177, 182 (Ill. App. Ct. 1973) (Illinois legislature passed Uniform Deceptive Practices Act to codify common law); see also, Corning Glass Works v. Jeannette Glass Co., 308 F. Supp. 1321, 1325 (S.D.N.Y. 1970) (The law regarding trademark infringement is a subset of the law prohibiting unfair competition; the purpose of both is to prevent a person from passing off his goods or services as those of another).  Accordingly, in ruling on the motions for summary judgment, the court will focus on the Lanham Act claims.

The purpose of the Lanham Act is to uphold trademarks in order "to protect the public from deceit, to foster fair competition, and

---

Furthermore, it appears that Indiana does not have a statute comparable to the IDTPA.  See Nucor Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V., No. IP 91-C-828, 1993 WL 723500, *11 (S.D. Ind. Feb. 23, 1993), aff'd 28 F.3d 572 (7th Cir. 1994).
     We need not resolve whether the IDTPA claim is viable at this time, however, because as a practical matter, it likely does not matter.  Super Wash has prevailed on its Lanham Act claims and the remedies available for Lanham Act violations are broader than those available for violations of the IDTPA.  Compare 15 U.S.C. § 1711(a) with 815 ILCS 510/3 (available remedies for Lanham  Act violations include defendant's profits, plaintiff's damages, costs of action, treble damages and attorney's fees, whereas IDTPA provides only for injunctive relief, costs and attorney's fees).  But because of the court's concerns about the IDPTA claim, we deny without prejudice Super Wash's motion for summary judgment as it relates to that count.  If a ruling on the IDTPA claim becomes necessary in the future, the parties should raise the issue with the court.

to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'" <u>Truck Equip. Serv. Co. v. Fruehauf Corp.</u>, 536 F.2d 1210, 1215 (8th Cir. 1976) (quoting S. Rep. No. 1333, 1946 U.S. Code Cong. Serv. at 1275). Section 1114(1) prohibits trademark infringement, providing that a person who uses or reproduces a registered trademark without consent in connection with the sale, offering for sale, distribution or advertising of any goods or services faces civil liability to the trademark holder. 15 U.S.C. § 1114(1). Similarly, § 1125(a)(1)(A) imposes liability for unfair competition against a party for any "false designation of origin . . . likely to cause confusion . . . as to the origin . . . of his goods." 15 U.S.C. § 1125(a)(1)(A). Through §§ 1114(1) and 1125(a),[11] "[t]he Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." <u>Home Box Office, Inc. v. Showtime/The Movie Channel Inc.</u>, 832 F.2d 1311, 1314 (2d Cir. 1987) (citing 15 U.S.C. §§ 1114(1)(a), 1125(a)).

---

[11] 15 U.S.C. § 1114(1) is also known as section 32(1) of the Lanham Act; 15 U.S.C. § 1125(a) is also known as section 43(a).

**B.   Analysis**

**1.   Summary of the Parties' Arguments**

To prevail on Lanham Act claims for trademark infringement and unfair competition, "a plaintiff must establish that (1) [its] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." Packman v. Chicago Tribune Co., 267 F. 3d 628, 638 and 638 n. 8 (7th Cir. 2001).   Here, however, defendants do not dispute that the Super Wash marks are registered and protectable, nor do they challenge the likelihood-of-confusion element.   Rather, defendants seek summary judgment on the ground that Super Wash consented to their use of the marks after the license agreement was terminated, and thus Super Wash cannot prevail on its Lanham Act claims as a matter of law.   See Dunkin Donuts, Inc. v. Towns Family, Inc., No. 95 C 3666, 1996 WL 328018, at *3 (N.D. Ill. June 11, 1996) (one element of trademark infringement is use of another's registered mark without consent). More specifically, defendants contend that Section I of the Operations Agreement gives Super Wash the right to remove the marks from the Upland Car Wash, so Super Wash, not defendants, had the duty to remove the marks when the license agreement was terminated. In failing to remove the marks, defendants argue, Super Wash effectively consented to defendants' use of the marks until Super Wash exercised its right to remove the signs and other logos.

Super Wash, on the other hand, contends that it is entitled to summary judgment on the issue of liability and that the only issue for trial is the appropriate award for damages. Super Wash maintains that (1) former licensees like defendants have a duty to remove the licensor's marks upon termination of the licensing agreement, and (2) Super Wash did not undertake any contractual duty to the contrary. In fact, Super Wash argues, the "unambiguous terms of the parties' Agreements" — namely paragraph 17(A) of the Articles of Agreement — "show that Defendants agreed to take down the Super Wash [m]arks upon termination of the license to use the [m]arks." (Pl.'s Mem. Support of Cross-Mot. Summ. J. at 10.)

## 2. Neither Contractual Provision Controls

As a threshold matter, the court will address whether the parties' contractual agreements imposed a duty on either party to remove the marks upon termination of the licensing agreement. Super Wash argues that the terms of the Articles of Agreement clearly and unambiguously place the duty on defendants, whereas defendants contend that the controlling document is the Operations Agreement, which places the duty to remove the marks on Super Wash. A plain reading of the contracts, however, shows that neither party is correct.

Quoting language excerpted from paragraph 17(A) of the Articles of Agreement, Super Wash argues that in the event the parties' relationship was terminated, Sterling was obligated to

"'remove all Super Wash identifications and logos from the [wash].'" (<u>Id.</u>) Although the quoted language is part of paragraph 17(A), the language is taken wholly out of context. Paragraph 17(A) is a provision under which Sterling undertook three specific, contractual obligations: (1) to execute an operations agreement, (2) not to use the name of "Super Wash, Inc." in any legal entity, and (3) to acknowledge that only Super Wash has the legal right to license its marks, so in the event Sterling sold the Upland Car Wash to a third party, the sale would not include the right to use the Super Wash marks unless the third party executed an operations agreement with Super Wash. Paragraph 17(A) then states:

> Should there be any default *in this provision*, the Buyer or the Buyer's assignee or grantee's right to use any Super Wash identification and logo is terminated 30 days after written notice of default. The Buyer or the Buyer's assignee or grantee shall within 30 days after the date written notice of default is mailed *remove all Super Wash identifications and logos from the installation.*

(Articles of Agreement ¶ 17(A), Ex. D. to Pl.'s L.R. 56.1 Response Statement (emphasis added).) The default provision of paragraph 17(A) does not impose a duty on Sterling to remove the marks in the event the licensing agreement is terminated, regardless of the reason for termination. Rather, according to the plain, unambiguous language of paragraph 17(A), the default provision applies only in the event Sterling fails to comply with any of the three specific contractual obligations set forth in paragraph 17(A), as described above. None of those contractual obligations

are at issue here, however, so paragraph 17(A) does not apply in this case.

But defendants' reliance on the Operations Agreement is equally misplaced. Although Section I of the Operations Agreement provides that Super Wash "may enter upon the property of the Operator without notice and without legal process and remove all Super Wash identification and logos," (Operations Agreement, Ex. C to Pl.'s L.R. 56.1 Resp. Statement), defendants take that quotation out of context. Section I, which pertains to the use of Super Wash's identifications and logos, provides that: (1) the right to display Super Wash's name, symbols, colors and other identification remains the property of Super Wash; (2) Super Wash "will provide the Operator with a 60-day written notice to remediate any substantial faults or failures in the operation or management of any location by the Operator[;]" and (3) in the event the Operator fails to correct any faults identified in such remediation notice during the 60 day remediation period, then Super Wash "may enter upon the property of the Operator without notice and without legal process and remove all Super Wash identification and logos so long as the same is done without damage to the underlying property." (Id.) The plain language of the Operations Agreement gives Super Wash the right — but not the obligation — to remove its marks from the Upland Car Wash under certain specified circumstances. As Super Wash correctly explains, the Operations Agreement gives it an

optional "self-help" remedy.  The contract language defendants rely upon does not impose a duty on Super Wash to remove its marks in the event the licensing agreement is terminated.

After reviewing the Operations Agreement and the Articles of Agreement in their entirety, it is evident that the contracts simply do not address the circumstances under which the parties' relationship may be terminated, nor do they address which party is required to remove the marks in the event of termination.  C.f. Travelodge Hotels, Inc. v. Elkins Motel Assoc., Inc., No. Civ. 03-799 (WHW), 2005 WL 2656676, at *1 (D.N.J. Oct. 18, 2005) (licensing agreement expressly provided that upon termination of license, licensee must cease using licensor's trademarks and must reimburse licensor for any costs relating to removal of signage).  The dispositive question, therefore, is which party bears responsibility for removing the marks under trademark law in the absence of controlling contractual provisions.

### 3.   There is No Genuine Issue Regarding Whether the Licensing Agreement was Terminated

Before answering that question, however, we first need to address whether the licensing agreement was, in fact, terminated. In their motion for summary judgment defendants initially acknowledge that the licensing agreement was terminated, but then later argue in response to Super Wash's cross-motion that the licensing agreement was not terminated.  Specifically, defendants contend that because Super Wash never provided a written

remediation notice in compliance with Section I of the Operations Agreement, the Operations Agreement was not terminated, and Super Wash's failure to use the remedy provided in the Operations Agreement thus constituted consent for defendants to continue to use the marks. This argument is flawed, however, because the provisions of Section I of the Operations Agreement are not applicable.

As explained earlier, the contracts do not identify the entire range of circumstances under which the contractual relationship could be terminated. The parties' contracts do not specify any duration for the licensing agreement, nor do they provide that the licensing agreement is terminable only for cause or only on the occurrence of a specific event. E.g., Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH, No. 03 C 2105, 2004 WL 46243, at *2 (N.D. Ill. Jan. 7, 2004) (citing Jespersen v. Minn. Mining & Mfg. Co., 700 N.E. 2d 1014, 1016 (Ill. 1998)) (agreement without fixed duration is terminable at will unless it specifies that it is terminable only for cause or only upon the occurrence of a specified event). Contracts of an indefinite duration are terminable at the will of either party under Illinois law, Jespersen, 700 N.E. 2d at 1016, and thus may be terminated "'for any reason, good cause or not, or no cause at all.'" Taylor v. Chicago Park Dist., No. 91 C 2380, 1991 WL 111154, *1 (N.D. Ill. June 17, 1991). Notice terminating the contract must be clear and

unequivocal, <u>Morris Silverman Mgmt. Corp. v. W. Union Fin. Serv.,
Inc.</u>, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003), but no particular
form of notice is required.  Because Section I of the Operations
Agreement is not applicable and no specific form of notice is
required to terminate an at-will contract, it makes no difference
whether Super Wash sent defendants a written remediation notice.

More importantly, there is no genuine issue regarding whether
the licensing agreement was terminated.  The conduct of the parties
may be considered in determining whether there has been a clear,
unequivocal termination of the contract.  <u>Id.</u> at 974.  It is
undisputed that after Super Wash called defendants on August 16,
2002 demanding that defendants cease using the marks, defendants
immediately removed all marks except for the exterior sign.  It
strains credibility to suggest that defendants would have removed
the marks if they thought the licensing agreement remained in
effect.  The parties' conduct thus demonstrates their mutual
understanding that the licensing agreement had been terminated.[12]

**4. Defendants had a Duty to Remove the Trademarks Upon
    Termination of the Licensing Agreement**

Having concluded that the licensing agreement was terminated,

_____

[12]/  Additionally, defendants' assertion that the licensing agreement was
not terminated is unpersuasive in light of the fact that defendants' own
complaint in a lawsuit pending in state court alleges that Sterling — not Super
Wash — terminated the relationship in November 2001.  (<u>C&W Group, Inc. v. Super
Wash, Inc.</u>, Compl. ¶ 27, Ex. A to Pl.'s Reply.)  Notably, if Section I of the
Operations Agreement set forth the only circumstances under which the parties
could end their relationship (which it does not), then defendants had no right
to terminate the licensing agreement under any circumstances because no provision
of either contract provides for termination by the licensee.

we turn to the controlling question: which party has the duty to remove licensed trademarks when the licensing agreement between a licensor and licensee is terminated and the contracts are silent on the issue? For the reasons that follow, the court concludes that the duty to remove the licensed trademarks belongs to the licensee.

As a general matter of trademark law, a licensee cannot continue to use a trademark after the license agreement is terminated. A trademark license is a grant of authority to use the licensor's trademark, Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000), and once the license ends, the licensee's right to use the trademark ends. The licensee's continued use "by its very nature[] constitutes trademark infringement," Burger King Corp. v. Majeed, 805 F. Supp. 994, 1002 (S.D. Fla. 1992), because "[a] licensee who once had authorization becomes associated in the public mind with the licensor or franchisor. When such a party loses authorization but continues use of the mark, the potential for consumer confusion is greater than in the case of the random infringer." Burger King Corp. v. Agad, 911 F. Supp. 1499, 1504 n. 4 (S.D. Fla. 1995) (internal quotation marks omitted). For that reason, courts repeatedly "have held that continued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement." Merry Maids Ltd. P'ship v. Kamara, 33 F. Supp. 2d 443, 445 (D. Md. 1998)

(collecting cases); <u>Gorenstein Enter., Inc. v. Quality Care-USA, Inc.</u>, 874 F.2d 431, 435 (7th Cir. 1989) (former licensee's continued use of trademark violates trademark law); <u>U.S. Structures, Inc. v. J.P. Structures, Inc.</u>, 130 F.3d 1185, 1190 (6th Cir. 1997) (former licensee's use of trademark after termination of license establishes likelihood of confusion); <u>Bunn-O-Matic</u>, 88 F. Supp. 2d at 922 ("likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license").  Because termination of the license terminates the licensee's right to use the trademark and any continued use constitutes trademark infringement as a matter of law, it follows that the licensee must take whatever steps are necessary to stop using the trademark when the licensing agreement ends.  <u>See, e.g.</u>, <u>Motor City Bagels, L.L.C. v. Amer. Bagel Co.</u>, 50 F. Supp. 2d 460, 485 (D. Md. 1999) (where former franchisee removed all of franchiser's trademarks except for the trademarks on exterior signs and register receipts, franchisee's continued use constituted trademark infringement and unfair competition in violation of the Lanham Act).  Indeed, "[i]t is hornbook law that '[o]nce a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark.  After the license has ended, the ex-licensee must stop use of the mark.'"  <u>Burger King</u>, 911 F. Supp. at 1503.  Removing the trademarks from all aspects of the licensee's business — <em>e.g.</em>,

signs, logos, uniforms, marketing materials, etc. — is an inherent, necessary part of stopping use of the mark. See Motor City Bagels, 50 F. Supp. 2d at 485.

Defendants' post-termination use of the Super Wash marks presents no exception to this general rule. Although defendants attempt to avoid Lanham Act liability by arguing that Super Wash consented to their continued use of the marks by waiting for defendants to remove the marks rather than removing them itself, this argument lacks merit. In making this argument, defendants offer no caselaw. Rather, they rely wholly on the provision in Section I of the Operations Agreement that gave Super Wash the option of removing its marks under certain circumstances. But as explained earlier, and despite defendants' argument to the contrary, that provision did not impose a duty on Super Wash to remove its marks upon termination of the licensing agreement. In the absence of such a contractual duty, no reasonable jury could conclude that Super Wash consented to defendants' continued use of their marks simply by declining to assume responsibility for removing the marks from the Upland Car Wash when the licensing agreement ended.

Because defendants lost the right to use the marks upon termination of the licensing agreement, it was their duty to remove the marks to avoid giving consumers the impression that the Upland Car Wash remained affiliated with Super Wash. By opting not to

remove (or at least cover) the exterior sign, defendants continued to use the Super Wash marks, and in doing so committed trademark infringement and unfair competition in violation of the Lanham Act.

**5. Damages**

With summary judgment granted in favor of Super Wash on the issue of liability, the only issue remaining for trial is the appropriate remedy for defendants' violations of the Lanham Act. In moving for summary judgment, Super Wash acknowledges that it will need to prove the amount of its damages and fees, but nevertheless asks the court to grant summary judgment for treble damages and attorney's fees on the ground that defendants' conduct constituted willful infringement. The court declines to rule on that issue now, however.

There are several reasons to defer ruling on Super Wash's request. For one thing, Super Wash's argument for treble damages and fees consists of no more than a single sentence in its briefing, and thus is not adequately developed. Additionally, it would be premature to determine whether damages should be trebled when Super Wash has not yet established that it is entitled to any damages. A determination that defendants violated the Lanham Act "does not automatically entitle [Super Wash] to damages." Sethness-Greenleaf, Inc. v. Green River Corp., Nos. 89 C 9203, 91 C 4373, 1995 WL 571415, at *2 (N.D. Ill. Sept. 21, 1995). Under the Lanham Act, a prevailing plaintiff generally is entitled to

recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a). Additionally, the court may treble a Lanham Act award in certain circumstances, <u>Sethness-Greenleaf</u>, 1995 WL 571415 at * 2 (citing 15 U.S.C. § 1117(a)), and "in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a); <u>Web Printing Controls Co., Inc. v. Oxy-Dry Corp.</u>, 906 F.2d 1202, 1204 (7th Cir. 1990).  However, any award for a Lanham Act violation is "subject to the principles of equity[.]"  15 U.S.C. § 1117(a). Indeed, as the Seventh Circuit has held, the district court has broad discretion under § 1117 to fashion a remedy for trademark infringement based on equitable considerations.  <u>Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator</u>, 392 F.3d 248, 259 (7th Cir. 2004).

We anticipate that equitable considerations will play a significant role in the remedy phase of this case.  If defendants truly invited Super Wash to remove the exterior sign upon termination of the licensing agreement, then it is possible that the damages Super Wash incurred (if any) could have been limited to the expense of removing the sign.  We know of no reason why Super Wash did not have a duty to mitigate its damages.

**6.  Super Wash's Motion to Strike Certain Paragraphs from Sterling's Affidavit Dated June 17, 2005**

There is one other pending motion: Super Wash's motion to strike portions of Sterling's affidavit dated June 17, 2005.

Specifically, Super Wash asks the court to strike paragraphs 2 through 4 of that affidavit. Because there was no need to consider the challenged paragraphs in order to rule on the parties' respective motions for summary judgment, plaintiff's motion to strike is denied as moot.

### CONCLUSION

For the reasons explained above, the court denies defendants' motion for summary judgment and grants Super Wash's cross-motion for summary judgment in part. Specifically, the court finds defendants liable for trademark infringement and unfair competition under the Lanham Act and for common law unfair competition, but denies plaintiff's motion as it relates to the claim under the Illinois Uniform Deceptive Trade Practices Act. Additionally, plaintiff's motion to strike portions of Sterling's affidavit dated June 17, 2005 is denied as moot.


DATED:   March 2, 2006


ENTER:
_____
       John F. Grady, United States District Judge